704 A.2d 73

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. KENNEDY SMITH, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 3, 1997—Decided December 29, 1997.

1

Before Judges BAIME, BROCHIN and BRAITHWAITE.

*Sylvia M. Orenstein*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney; *Ms. Orenstein*, of counsel and on the brief).

*Catherine A. Foddai*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General, attorney; *Ms. Foddai*, of counsel and on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

A Middlesex County grand jury returned an indictment charging defendant with first degree attempted murder (*N.J.S.A.* 2C:5–1; *N.J.S.A.* 2C:11–3a(1)), attempted aggravated sexual assault (*N.J.S.A.* 2C:5–1; *N.J.S.A.* 2C:14–2a(6)), second degree kidnapping (*N.J.S.A.* 2C:13–1b), and first degree robbery (*N.J.S.A.* 2C:15–1). Following the denial of his motion to suppress his confession, defendant entered an unconditional plea of guilty to attempted murder and first degree robbery and was sentenced to concurrent terms of twenty years with ten year parole disqualifiers. In addition to the custodial terms imposed, the Law Division ordered defendant to pay restitution of $54,681.96 as well as future medical bills of the victim, and assessed a Violent Crimes Compensation Board penalty of $200 and a Safe Neighborhoods Services Fund fine of $150. Pursuant to the terms of the plea agreement, the remaining counts were dismissed.

Defendant appeals, contending: (1) the Law Division erroneously denied his motion to suppress his confession, (2) the sentences imposed were excessive, and (3) the restitution order must be

vacated because no hearing was conducted respecting his ability to pay. We affirm defendant's convictions and the custodial sentences imposed, but vacate the Safe Neighborhoods Services Fund fine and the restitution order. We remand the matter to the Law Division for a hearing to determine an amount of restitution consistent with defendant's ability to pay.

## I.

The salient facts can be summarized as follows: In the evening hours of October 3, 1990, N.G. was walking home after attending a PTA meeting when she was accosted, compelled to accompany her assailant to a desolate area, and brutally attacked. The victim suffered life-threatening injuries, including fractures of the skull, vertebra, facial bones and nose. In the course of the vicious attack, the assailant attempted to rape the victim, and when his efforts proved unsuccessful, made off with her pocketbook.

The identity of the assailant remained undetected until December 30, 1990. On that date, Detective Charles Moe received a telephone call from an unidentified female who informed him that she was an employee of the Raritan Bay Medical Center in Perth Amboy (Raritan Hospital) and had learned of information concerning a crime. The anonymous caller related that she had overheard defendant, a psychiatric patient, admit to a member of the hospital medical staff he had assaulted a woman in Metuchen in October of 1990. After corroborating the fact that defendant was a patient, Detective Moe prepared a report containing a description of his conversation with the informer.

On January 2, 1991, Detective James Keane contacted Raritan Hospital and was informed by Sam David, a senior psychiatric social worker, that defendant was a patient. Detective Keane knew defendant, who had on occasion provided him with information concerning various criminal activities, and requested permission to speak to him. David indicated that the detective was free to interview defendant if defendant consented. Defendant con-

sented to the interview, telling David that he considered Detective Keane "a friend."

Later that day, Detective Keane and Officer Steven Wilczynski proceeded to the hospital, where they were escorted by David into a private room. After apprising defendant of his constitutional rights and obtaining a waiver, Detective Keane stated the purpose of his investigation. Defendant denied any involvement in the assault, noting that he was with his fiance in Georgia on the night the crime was committed. Defendant added that he had been admitted to a hospital in Georgia because he was suffering from mood swings and was experiencing behavioral problems. Perhaps tellingly, defendant inquired about the condition of the victim and whether she was able to remember the assault. However, defendant refused to answer any other questions.

On January 3, 1991, Detective Keane received a telephone call from David, who told him that defendant wished to speak to him. David then handed the telephone to defendant, who asked the detective to visit him so that they could converse alone. Detective Keane returned to the hospital where he obtained permission to speak to defendant from defendant's treating psychiatrist. The detective again apprised defendant of his constitutional rights. Detective Keane told defendant it was in his best interest to cooperate with the police and that if he provided assistance, Keane would ensure that he would "get help." The detective added that defendant would be charged with the crime whether or not he cooperated. Defendant admitted that he had lied the previous day, and that he was responsible for the assault. Moreover, defendant agreed to give a tape recorded statement. In the statement, defendant noted that he "felt guilty" about committing the crime and "wanted God to forgive him."

Defendant's treating psychiatrist testified that he permitted Detective Keane to interview defendant because defendant had requested it and because his mental state was clear. The witness added he would not have allowed the interview to proceed if defendant appeared confused or incoherent. The physician noted

that defendant was being treated with lithium and mellaril, but the dosages were low and would not affect a patient's judgment or competency. In fact, a psychiatric team had met on the morning of January 3 prior to defendant's interview with Detective Keane and had decided to discharge him because his condition was stable.

Dr. Irwin Perr, a psychiatrist, interviewed defendant following his arrest at the Middlesex County Jail, and performed a battery of tests. The witness noted that defendant had been hospitalized in Georgia, where he was "non-complacent, resistant and aggressive." The doctor indicated that defendant could not be easily intimidated, and that, with his personality type, was less likely than the average person to obey a command or be coerced. According to Dr. Perr, defendant had no mental disorder that would interfere with his decision-making ability. Dr. Perr agreed with defendant's treating psychiatrist that, although psychotropic drugs were being administered, they had no impact on the patient's judgment.

Defendant elected to testify at the motion hearing. We do not describe his testimony in detail because the Law Division clearly disbelieved his account. Suffice it to say, defendant claimed that his treating psychiatrist convinced him to confess, and that Detective Keane turned off the recording machine during various parts of the interview when he gave information unfavorable to the prosecutor's case.

The defense presented Dr. Robert Latimer, a psychiatrist. He testified that defendant suffered from a borderline personality disorder that made him particularly vulnerable to the suggestions of his treating psychiatrist. The witness also claimed that lithium and mellaril had the capacity to lead a patient "down the primrose path." Dr. Latimer added, however, that even absent the administration of psychotropic drugs, defendant could not have voluntarily confessed. The witness observed that "any mature, knowledgeable person" would have requested a lawyer under the circumstances confronting defendant.

The Law Division issued a comprehensive written opinion in which it concluded that defendant's confession was admissible. The court first found that defendant was not in police custody when the inculpatory statement was made. Noting that defendant had voluntarily committed himself to the hospital and was not led to believe he was under arrest, the court determined that the coercive atmosphere inherent in custodial interrogation was not present. The court found alternatively that defendant freely and voluntarily waived his constitutional rights.

The court also considered defendant's claimed violation of the psychologist-patient privilege. The court determined that any information given by defendant to his doctor or the treatment team was privileged and could not be admitted in evidence. So too, the court excluded evidence relating to the information received by Detective Moe from the anonymous caller. The court concluded, however, that defendant's confession was unaffected by the violation of the psychologist-patient privilege.

## II.

Defendant contends that his confession was inadmissible because (1) it was the product of unlawful custodial interrogation, and (2) it was obtained as a result of the violation of his psychologist-patient privilege. We find no substance in these contentions.

Preliminarily, we note that defendant's arguments are not cognizable because his plea of guilty was unconditional. Generally, a guilty plea constitutes a waiver of all issues that were or could have been raised in prior proceedings. *Tollett v. Henderson,* 411 *U.S.* 258, 267, 93 *S.Ct.* 1602, 1608, 36 *L.Ed.*2d 235, 243 (1973); *State v. Truglia,* 97 *N.J.* 513, 522–24, 480 *A.*2d 912 (1984); *State v. Alevras,* 213 *N.J.Super.* 331, 339–40, 517 *A.*2d 460 (App.Div.1986); *State v. Rosenberg,* 160 *N.J.Super.* 78, 80, 388 *A.*2d 1298 (App.Div.), *certif. denied,* 78 *N.J.* 332, 395 *A.*2d 201 (1978); *State v. Raymond,* 113 *N.J.Super.* 222, 226–27, 273 *A.*2d 399 (App.Div.1971). "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with

which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson,* 411 *U.S.* at 267, 93 *S.Ct.* at 1608, 36 *L.Ed.*2d at 243. *See also State v. Peters,* 129 *N.J.* 210, 216–17, 609 *A.*2d 40 (1992); *State v. Vasquez,* 129 *N.J.* 189, 193–94, 609 *A.*2d 29 (1992); *State v. DeLane,* 207 *N.J.Super.* 45, 48, 503 *A.*2d 903 (App.Div.1986); *State v. Keegan,* 188 *N.J.Super.* 471, 474–75, 457 *A.*2d 1205 (App.Div.), *certif. denied,* 93 *N.J.* 320, 460 *A.*2d 710 (1983).

Under New Jersey practice, there are three exceptions to the general rule of waiver. Notwithstanding entry of a guilty plea, a defendant may appeal from the denial of his motion to suppress as permitted by *R.* 3:5–7(d), from the denial of his application for admission into a pretrial intervention program pursuant to *R.* 3:28(g), and, with consent of the court and approval of the prosecutor, from any other pretrial order when the issue is preserved under *R.* 3:9–3(f). None of these exceptions are applicable here. *Rule* 3:5–7(d) pertains only to motions to suppress evidence allegedly obtained by reason of an unlawful search and seizure. *State v. Robinson,* 224 *N.J.Super.* 495, 499–500, 540 *A.*2d 1313 (App.Div. 1988). We have thus held that "unsuccessful challenges to statements and *Miranda* violations cannot be raised on appeal after a guilty plea pursuant to *R.* 3:5–7(d)." *Id.* at 500, 540 A.2d 1313 (citations omitted). *Rule* 3:28(g) is plainly inapplicable. And finally, defendant's plea was unconditional, and the issue of the admissibility of defendant's statement was not preserved under *R.* 3:9–3(f).

While we need not address the merits of defendant's arguments, we choose to do so in the interests of justice. We consider these contentions *seriatim.*

## A.

Initially, we need not determine whether defendant was in police custody when he was questioned by Detective Keane. Custodial interrogation consists of "questioning initiated by law

enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 *U.S.* 436, 444, 86 *S.Ct.* 1602, 1612, 16 *L.Ed.*2d 694, 706 (1966). The rights set forth in *Miranda* are not implicated "when the detention and questioning is part of an investigatory procedure rather than a custodial interrogation," *State v. Pierson*, 223 *N.J.Super.* 62, 66, 537 *A.*2d 1340 (App.Div. 1988) (citing *United States v. Booth*, 669 *F.*2d 1231, 1237 (9th Cir.1981); *State v. Godfrey*, 131 *N.J.Super.* 168, 175–78, 329 *A.*2d 75 (App.Div.1974), *aff'd o.b.*, 67 *N.J.* 267, 337 *A.*2d 371 (1975)), or where the restriction on a defendant's freedom is not of such significance as to compel the conclusion that his liberty is restrained. *Ibid.* (citing *Oregon v. Mathiason*, 429 *U.S.* 492, 495, 97 *S.Ct.* 711, 714, 50 *L.Ed.*2d 714, 719 (1977); *State v. Seefeldt*, 51 *N.J.* 472, 482, 242 *A.*2d 322 (1968); *State v. Downey*, 206 *N.J.Super.* 382, 396–97, 502 *A.*2d 1171 (App.Div.1986), *certif. denied*, 121 *N.J.* 627, 583 *A.*2d 323 (1990)). Pertinent factors include the duration of the detention, the nature and degree of the pressure applied to detain the individual, the physical surroundings of the interrogation and the language employed by the police. *United States v. Booth*, 669 *F.*2d at 1235; *State v. P.Z.*, 152 *N.J.* 86, 102–103, 703 *A.*2d 901 (1997); *State v. Pierson*, 223 *N.J.Super.* at 67, 537 *A.*2d 1340; *State v. Cunningham*, 153 *N.J.Super.* 350, 352–53, 379 *A.*2d 860 (App.Div.1977); *State v. Godfrey*, 131 *N.J.Super.* at 175–77, 329 *A.*2d 75. Although the Law Division carefully considered these factors in determining that defendant was not in custody, we elect to decide the admissibility of the confession on surer grounds.

We are satisfied that defendant was fairly apprised of his constitutional rights and voluntarily waived them. We are also convinced that the statement given by defendant was voluntary. More specifically, the record amply supports the Law Division's conclusion that the State sustained its burden of proving beyond a reasonable doubt a voluntary, intelligent and knowing waiver of defendant's constitutional rights, and a confession that was not the

product of police overreaching. *State v. Chew,* 150 *N.J.* 30, 65, 695 *A.*2d 1301 (1997); *State v. Galloway,* 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993); *State v. Franklin,* 52 *N.J.* 386, 402–03, 245 *A.*2d 356 (1968); *State v. Cook,* 47 *N.J.* 402, 415, 221 *A.*2d 212 (1966). The Law Division's findings in that respect are supported by substantial, credible evidence. *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964). In reaching this conclusion pertaining to the issue of waiver, we have considered the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation. *State v. P.Z.,* 152 *N.J.* 86, 113-114, 703 *A.*2d 901; *State v. Chew,* 150 *N.J.* at 65, 695 *A.*2d 1301; *State v. Galloway,* 133 *N.J.* at 654, 628 *A.*2d 735. As to the voluntariness of the statement given, our inquiry has focused upon such factors as defendant's age, education, intelligence and mental state, the advice given by Detective Keane respecting the applicable constitutional rights, the length of the interrogation, the duration of the detention, whether questioning was repeated and prolonged in nature, and whether physical punishment or mental exhaustion was involved. *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 226, 93 *S.Ct.* 2041, 2047–48, 36 *L.Ed.*2d 854, 862 (1973). Contrary to defendant's claim, nothing in the record suggests that "inherently coercive" psychologically-oriented techniques were employed either to obtain a waiver of defendant's constitutional rights or to obtain the resulting confession. *State v. Galloway,* 133 *N.J.* at 654, 628 *A.*2d 735. *See also State v. Miller,* 76 *N.J.* 392, 405, 388 *A.*2d 218 (1978).

The fact that defendant was suffering from a mental illness at the time of the questioning did not render his waiver or his statement involuntary. The United States Supreme Court has held that "coercive police activity is a necessary predicate to [a] finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 *U.S.* 157, 167, 107 *S.Ct.* 515, 522, 93 *L.Ed.*2d 473, 484 (1986). The Court stressed that the "Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'"

*Id.* at 170, 107 *S.Ct.* at 523, 93 *L.Ed.*2d at 486 (quoting *Oregon v. Elstad,* 470 *U.S.* 298, 304–05, 105 *S.Ct.* 1285, 1290, 84 *L.Ed.*2d 222, 229 (1985)). "The voluntariness of a waiver of this privilege [was said to] depend[ ] on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Ibid.* The Court added that "the relinquishment of the right [to remain silent] must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception...." *Ibid.* (citing *Moran v. Burbine,* 475 *U.S.* 412, 421, 106 *S.Ct.* 1135, 1141, 89 *L.Ed.*2d 410, 421 (1986)).

We need not determine whether the New Jersey Constitution affords greater protection than that granted by the Due Process Clause. Instead, we are in complete accord with the Law Division's conclusion that defendant's will was not overborne and that his confession was neither the product of police coercion nor the result of mental illness. We are constrained to add the following brief comments relating to the thesis underlying much of Dr. Latimer's testimony. Dr. Latimer testified that defendant's confession was the product of his mental illness because no rational person would admit to such serious crimes without requesting an attorney. The Law Division rejected that thesis, and so do we. "Voluntary confessions accord with high moral values...." *State v. McKnight,* 52 *N.J.* 35, 52, 243 *A.*2d 240 (1968). The fact that defendant confessed in order to shed his inner burden, and perhaps did not perceive or place any importance upon the statement's legal consequences does not render his waiver involuntary or irrational. "The Constitution is not at all offended when a guilty man stubs his toe." *Ibid.*

## B.

We also reject defendant's argument that the confession should have been suppressed because the police learned of his involvement in the crimes when an employee of the Raritan Hospital violated his right to confidentiality. Although defendant couches his argument in terms of the psychologist-patient privi-

lege, the record indicates that he was being treated by a psychiatrist. It would thus appear that the physician-patient privilege (*N.J.S.A.* 2A:84A-22.1 to -22.2; *N.J.R.E.* 506), and not the psychologist-patient privilege (*N.J.S.A.* 45:14B-28; *N.J.R.E.* 505), is implicated. *See Ritt v. Ritt,* 52 *N.J.* 177, 181, 244 *A.*2d 497 (1968); *cf. State v. Long,* 119 *N.J.* 439, 479, 575 *A.*2d 435 (1990); *Gabor v. Hyland,* 166 *N.J.Super.* 275, 278-79, 399 *A.*2d 993 (App.Div.1979). We need not dwell upon the question because we regard the distinction as irrelevant in the context of the issue presented.

We recognize that the nature of psychotherapy "might well justify a greater degree of confidentiality and protection than is generally afforded medical treatment of a physical condition." *Arena v. Saphier,* 201 *N.J.Super.* 79, 86, 492 *A.*2d 1020 (App.Div. 1985). The nature of psychiatric treatment "is such that full disclosure to the therapist of the patient's most intimate emotions, fears and fantasies is required." *Ibid.* While "[m]any physical ailments might be treated with some degree of effectiveness by a doctor whom the patient [does] not trust," a psychiatrist "must have his patient's confidence or he cannot help him." *Taylor v. United States,* 222 *F.*2d 398, 401 (D.C.Cir.1955). Whether viewed in the context of the physician-patient privilege or the psychologist-patient privilege, we fully acknowledge that public policy requires protection of the confidentiality of communications made to a therapist in the course of treatment.

We nevertheless add that the privilege advances secrecy, and thus "runs counter to the fundamental theory of our judicial system that the fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice." *In re Selser,* 15 *N.J.* 393, 405, 105 *A.*2d 395 (1954). The underlying theories are patently antithetical. In seeking to accommodate these competing policies, we recognize that they are not static. " 'The social policy that will prevail in many situations' will run afoul in others of more important societal concerns...." *United Jersey Bank v. Wolosoff,* 196 *N.J.Super.* 553, 560, 483 *A.*2d 821 (App.Div.1984) (quoting *Clark v. United States,* 289 *U.S.* 1, 13, 53 *S.Ct.* 465, 469, 77 *L.Ed.*

993, 999 (1933)). "It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each." *Id.* at 560–61, 483 *A*.2d 821.

Here, for example, it is unclear whether the anonymous tipster who apprised the police of defendant's possible involvement in the crime was a member of the treatment team or merely an interloper who overheard the incriminating statements. Other than defendant's testimony, no direct evidence was presented to support the assertion that the anonymous caller was a member of the treatment team. Substantial authority exists for the proposition that an "eavesdropper may testify to confidential communications." 1 *McCormick on Evidence* § 74 at 275 (Strong, 4th ed.1992). In the context of the attorney-client privilege, for example, it has been said that, "[s]ince the means of preserving secrecy of communication are largely in the client's hands and since the privilege is a derogation from the general testimonial duty and should be strictly construed, it would be improper to extend its prohibition to third persons who obtain knowledge of the communications." 8 *Wigmore on Evidence* § 2326 at 633 (McNaughton rev.1961). Thus, "[o]ne who overhears the communication, whether with or without the client's knowledge, is not within the protection of the privilege." *Id.* at 633–34. The same rule "appl[ies] to one who surreptitiously reads or obtains possession of a document in original or copy." *Id.* at 634. *Compare State v. Loponio,* 85 *N.J.L.* 357, 360–61, 88 *A.* 1045 (E. & A.1913), *with Trilogy Communications v. Excom Realty,* 279 *N.J.Super.* 442, 445, 652 *A.*2d 1273 (Law Div.1994).

Recently, in the context of the marital communications privilege, our Supreme Court in *State v. Szemple,* 135 *N.J.* 406, 640 *A.*2d 817 (1994), held that the privilege was not applicable to a written communication obtained by a third party. *Id.* at 417, 640 *A.*2d 817. The Court concluded that "the involvement of a third party vitiate[d] the requirement of confidentiality." *Ibid.* The Court's refusal to apply the privilege comported with prior decisions dealing with the subject. *See, e.g., State v. Young,* 97 *N.J.L.* 501,

505, 117 *A.* 713 (E. & A.1922); *State v. Laudisi,* 86 *N.J.L.* 230, 231, 90 *A.* 1098 (E. & A.1914); *State v. Sidoti,* 134 *N.J.Super.* 426, 430–31, 341 *A.*2d 670 (App.Div.1975); *State v. Brown,* 113 *N.J.Super.* 348, 353, 273 *A.*2d 783 (App.Div.1971).

Because it was not established below that the anonymous caller was a member of the treatment team, we are disinclined to apply the privilege in the circumstances of this case. As we pointed out, privileges undermine the search for the truth. *See Trammel v. United States,* 445 *U.S.* 40, 50, 100 *S.Ct.* 906, 912, 63 *L.Ed.*2d 186, 195 (1980); *United States v. Nixon,* 418 *U.S.* 683, 710, 94 *S.Ct.* 3090, 3108, 41 *L.Ed.*2d 1039, 1065 (1974). They are plainly inhibitive and should be applied only when a clear foundational basis has been established.

We reject defendant's argument for another reason. Assuming that a member of the treatment team violated the privilege, it is undisputed that the police were blameless. "Although we can caution law-enforcement officers not to cajole hesitant hospital doctors to violate confidences absent some preceding justification, we cannot expect diligent, conscientious officers like [Detectives Moe and Keane] to ignore evidence voluntarily placed before them." *State v. Schreiber,* 122 *N.J.* 579, 587, 585 *A.*2d 945 (1991); *cf. State v. Bodtmann,* 239 *N.J.Super.* 33, 43, 570 *A.*2d 1003 (App.Div.1990); *State v. Barrett,* 220 *N.J.Super.* 308, 313 n. 4, 531 *A.*2d 1368 (Law Div.1987), *aff'd in part, rev'd in part on other grounds sub nom. State v. Morant,* 241 *N.J.Super.* 121, 574 *A.*2d 502 (App.Div.), *certif. denied,* 127 *N.J.* 323, 604 *A.*2d 598 (1990). The police in no way violated defendant's privileged communication. Instead, they did no more than investigate the facts brought before them. To punish the police, and the public, for unlawful actions of private citizens would be an unwarranted extension of the exclusionary principles applicable to involuntary confessions.

The exclusionary rule respecting involuntary confessions must be anchored to the reason for its existence. The policy is rooted in history. The right to remain silent "was developed by painful opposition to a course of ecclesiastical inquisitions and Star Cham-

ber proceedings occurring several centuries ago." *Michigan v. Tucker,* 417 *U.S.* 433, 440, 94 *S.Ct.* 2357, 2361, 41 *L.Ed.*2d 182, 190 (1974). Coercive government misconduct was the catalyst for the United States Supreme Court seminal confession case, *Brown v. Mississippi,* 297 *U.S.* 278, 56 *S.Ct.* 461, 80 *L.Ed.* 682 (1936). In every confession case decided by the Court since *Brown,* the focus has been "upon the crucial element of police overreaching." *Colorado v. Connelly,* 479 *U.S.* at 163, 107 *S.Ct.* at 520, 93 *L.Ed.*2d at 482. "Our 'involuntary confession' jurisprudence is entirely consistent with the settled law requiring some sort of 'state action' to support a claim of violation of the Due Process Clause of the Fourteenth Amendment." *Id.* at 165, 107 *S.Ct.* at 521, 93 *L.Ed.*2d at 483. *But see State v. Kelly,* 61 *N.J.* 283, 294 *A.*2d 41 (1972). Absent police misconduct, we find no reason to suppress defendant's confession.

We are not persuaded by defendant's claim that suppression of the confession is necessary to vindicate the policy goals underlying the physician-patient privilege. In our view, defendant's argument is misdirected. If defendant's confidences were violated by a member of the treatment team, he may sue the offending party. But to conceal evidence of defendant's guilt to the end that he may escape conviction would constitute a serious insult to the judicial process. If the truth were to be suppressed and defendant set free, the pain of suppression would be felt, not only by the inanimate public, or by some penitent psychiatrist or hospital employee, but by potential future victims for whose protection we hold office. We perceive no reason to deny the innocent the protection due them.

### III.

We discern no sound basis to disturb the custodial sentences imposed. Defendant's argument that the sentences were excessive is clearly without merit. *R.* 2:11–3(e)(2). However, the Law Division erred by failing to conduct a hearing concerning defendant's ability to pay restitution. *N.J.S.A.* 2C:44–2c; *see*

*State in Interest of R.V.*, 280 *N.J.Super.* 118, 654 *A.*2d 999 (App.Div.1995). The court is to set appropriate conditions consonant with defendant's current and foreseeable ability to pay. Further, we vacate the Safe Neighborhoods Services Fund fine, because the crime was committed prior to the legislative enactment authorizing that assessment.

The convictions and custodial sentences imposed are affirmed. The Safe Neighborhoods Services Fund fine is vacated. The order of restitution is reversed, and the matter is remanded for a hearing concerning defendant's ability to pay.