800 A.2d 189 (2002)
352 N.J. Super. 338
STATE of New Jersey, Plaintiff-Respondent,
v.
Taihisha BROWN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 1, 2002.
Decided June 27, 2002.
*191 Susan Brody, Assistant Deputy Public Defender, argued the cause for appellant (Peter A. Garcia, Acting Public Defender, attorney; Ms. Brody, of counsel and on the brief).
Johanna Barba, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Ms. Barba, of counsel and on the brief).
Before Judges STERN, EICHEN and COLLESTER.
*190 The opinion of the court was delivered by *192 EICHEN, J.A.D.
Union County Indictment No. 98-10-1426 charged defendant Taihisha Brown with fourth degree possession of CDS (marijuana), N.J.S.A. 2C:35-10a(3) (count one), and first degree possession of CDS (marijuana) with intent to distribute, N.J.S.A. 2C:35-5a(1) (count two). Following the denial of her "motion to suppress" evidence, she entered a guilty plea to count two in exchange for the State's agreement to dismiss count one and to recommend that she be sentenced to five years in prison as a second degree offender. At the time of the negotiated plea, defendant did not specifically reserve her right to appeal the admission of her statements as required by R. 3:9-3(f).[1] The court sentenced defendant in accordance with the terms of the plea agreement. Appropriate fines and penalties were also imposed. Defendant then appealed the denial of her "motion to suppress." Bail was continued pending the appeal.
The conviction stems from an investigatory stop of defendant by officers of the Drug Enforcement Agency (DEA) assigned to Newark International Airport following defendant's arrival on an American Airlines flight from Los Angeles, California. Defendant was asked if she would accompany the agents to the airline office after she could not produce identification or her plane tickets and after an unclaimed suitcase suspected of belonging to defendant was sniffed by a narcotics dog which reacted positively to the presence of drugs inside the bag. Defendant agreed to go with the DEA agent and on route confessed to owning the suitcase and knowing it contained marijuana.
On appeal, defendant argues that (1) her statements admitting ownership of the suitcase containing the marijuana should have been suppressed because they resulted from custodial police questioning, i.e., a de facto arrest, without the required administration of Miranda[2] warnings; and (2) defendant's consent to search was invalid because it was the result of "coercive circumstances."
These are the relevant specific facts. On June 17, 1998, at about 5:00 p.m., defendant arrived on an American Airlines flight from Los Angeles at Newark Airport. Prior to departing from Los Angeles, defendant had checked a suitcase on board which she knew contained fifty-five pounds of marijuana and which she intended to deliver to an individual in New York City. Upon her arrival, she was placed under surveillance by Detective Charles Benoit, a Port Authority police officer assigned to the DEA Task Force as an undercover officer. Detective Benoit testified that because "narcotics are routed into this area from Southern California" he, Detective Kane[3] and Special Agent Mark Rusin, who was in charge, were watching the passengers disembark from the 5:00 p.m. flight from Los Angeles when his attention was drawn to defendant by her unusual clothing.[4]
A short time later, Detective Benoit saw defendant again at the baggage claim area standing back approximately ten feet from the carousel. This behavior also aroused his suspicion. Detective Benoit watched *193 defendant approach a sky cap, and walk outside with him. Special Agent Mickey Caspar and Detective DellaSerra were then directed to go outside and watch her. Within "a matter of minutes[,] all the luggage was retrieved and the people walked away." Only one bag remained. The bag was then placed to the side of the carousel, and it was determined that it had been checked in by a Taihisha Brown. Detective Benoit remained with the suitcase while Agent Rusin went to get a narcotics detecting dog. Within a few moments, the dog appeared with its handler and "alerted to the bag, [indicating] the presence of narcotics in the suitcase." At this point, approximately twenty to twenty-five minutes had elapsed since defendant had gone outside the terminal.
Detective Benoit then approached the sky cap who had been previously talking with defendant outside. The sky cap reported that defendant had asked him to retrieve the suitcase from the carousel, but he told her he could not get the bag without a claim check and that she said, "I can't give you the claim check." Meanwhile, defendant was observed through the "glass walls ... start[ing] to move toward a taxi stand." Detective Benoit immediately proceeded outside with Detective Kane following behind, "the suitcase in tow." Officer Caspar and Detective DellaSerra, who were already outside, approached defendant. Detective DellaSerra testified that defendant "was about to get into a cab." However, they showed their badges, identifying themselves, and Detective DellaSerra asked defendant if he could speak with her. Defendant agreed and did not get into the taxi. Detective DellaSerra then asked defendant for identification and her ticket. Defendant responded that "she [had] lost her i.d." but that her name was "Nakita Dalrimple."
Detective DellaSerra testified that he heard Detective Kane say that the dog had alerted to the suitcase and that, in his view, that "was enough to take her into cust[ody]she wasn't free to go at that point." However, Detective DellaSerra stated he never told defendant she was under arrest or that she was not free to leave, also maintaining that he did not touch defendant. In fact, Detective DellaSerra testified that he told her "you're not under arrest, you're free to go."[5]
Within moments, Detective Benoit arrived with Detective Kane and the suitcase, and began speaking with defendant. At that point, Detective DellaSerra stepped back several feet to wait with the other three officers who were standing nearby. Detective Benoit stated that as he arrived, he heard defendant tell Detective DellaSerra that she had lost her ticket and her identification, and heard her give the name "Nakita Dalrimple." Defendant also told Detective DellaSerra that she was a stripper who had been at a party in Los Angeles. With this information in mind, Detective Benoit introduced himself and asked defendant "if it was her suitcase and if she was Taihisha Brown." She replied "no," but then volunteered that "she knew Taihisha Brown, [that] they had flown together out to California, but she didn't return with her." Knowing that the suitcase could not have been transported without its owner checking in on board, Detective Benoit became even more suspicious of defendant. He then asked defendant "if she would accompany [them] to the American Airlines baggage claim office to verify the information that she had volunteered and she said she would."
"On the way back defendant told [Detective] Benoit that she was Taihisha Brown and that she had identification and the *194 baggage claim check in her pocket." Detective Benoit then took defendant into custody. According to Detective Benoit, from the time they initially approached defendant and her admission that it was her suitcase it was only "a couple of minutes." After defendant admitted her ownership of the suitcase and was placed under arrest, she was taken to the task force office for processing.
Detective Benoit further testified that upon arrival at the office, he gave defendant her Miranda warnings. He also stated that she indicated she understood them, and signed the Miranda card. In addition, after being advised of her right to refuse to consent, defendant consented to a search of the suitcase. It was approximately 6:00 p.m. at this point.
Defendant testified at the suppression hearing and admitted to being paid to transport the marijuana from Los Angeles. She claimed this was the first time she had ever committed a crime. She claimed that when she arrived she felt ill and, therefore, spoke to the sky cap about bringing her bag outside. Defendant stated she is an epileptic. She claimed the sky cap realized she was ill and asked if he could help her. She asserted she then asked him to bring her bag outside but that he told her he was not allowed to. She maintained he did not ask her for a claim check.
Defendant also stated that as she was about to get into a taxicab, Detective DellaSerra approached her, identified himself and asked her to step to the side "and please speak to me." According to defendant, he escorted her, "like arm in arm ... mov[ing] me a couple of feet to the side." By then, one of the other officers had the suitcase and the other three were "already there." She claimed Detective DellaSerra asked if he could see her shoulder bag and she said "yes." Another officer then "rummaged through the bag."
However, defendant did not dispute Detective Benoit's version of the investigatory stop. Defendant admitted telling Detective Benoit she was on the flight from Los Angeles but that she had lost her wallet which held her ticket and identification. Detective Benoit asked her what seat she was in but she could not remember the number. She testified that Detective Benoit told her it would be easy to find out, stating "we can easily walk over ... to go [to] the airlines agent and find out what seat ... [she] was in." According to defendant, "[t]hat's when two detectives escorted [her] to the agent." On route to the office, she claimed they urged her to admit she was Taihisha Brown and it was her suitcase because "we don't want to embarrass you, you might as well just tell us ... you're in a whole lot of trouble." As a result, she became upset and began to cry, and told them the truth.
At the "motion to suppress," defendant argued that she was "in custody" when she made these admissions, and because they were made without the benefit of Miranda warnings, they must be suppressed. Although conceding that the DEA agents had "a reasonable basis to stop and question her ... [,] the period of time they took to do that crossed the line." Defendant maintained that they exceeded the time during which they should have either confirmed or dispelled their suspicions, and that "she was in fact in custody" and should have been advised of her constitutional rights. Because she was not so advised, she maintained "[e]verything that flows from that should be suppressed. Not only the statement ... but the seizure of drugs as well." The State responded that the total time they were speaking to her was "five minutes," and that was a reasonable time in which to conduct their investigation. In addition, the prosecutor objected to defendant raising Miranda issues *195 because she had not been noticed that defendant was seeking a Miranda hearing.
The motion judge rejected this latter objection noting that this was not "a classic Miranda hearing" involving questions of "voluntariness," stating that "if the arrest is flawed, everything falls." Thereafter, the judge reviewed the evidence identifying the escalating suspicious circumstances that led to defendant's arrest in order to determine whether the investigatory detention or "Terry"[6] stop was justified and whether the duration of the stop was reasonable. Citing State v. Dickey, 152 N.J. 468, 478, 706 A.2d 180 (1998), the judge concluded that the officers's detention of defendant to pursue their investigation was only long enough to confirm or dispel their beliefs that she was or was not a drug courier, and implicitly determined that the stop was not unreasonable under the Fourth Amendment.
The judge then turned her attention to the question whether defendant was nonetheless "in custody" for purposes of her entitlement to Miranda warnings. The judge discussed and rejected Detective DellaSerra's testimony that he told defendant she was free to go when they were out on the sidewalk, noting that Detective DellaSerra had taken defendant's arm to lead her away from the taxicab stand, and that defendant was "frightened." The judge also noted Detective DellaSerra's testimony that "in [his] mind [defendant] was not free to go." Accordingly, the judge concluded that, at least at that point, "[defendant] wasn't free to go." However, because Detective DellaSerra let her go and moved off, and Detective Benoit asked defendant, and did not command her, "to go into the next office so that they can confirm her story," the judge concluded that "defendant was free to leave" essentially because she "didn't say `no, I won't go with you.'" In addition, the judge determined that because there was no "unnecessary delay, handcuffs, [or placing of defendant] in a police car ... or in a DEA office," she was not "in custody" when she confessed.

I.
We address first the threshold issue whether defendant's argument that her right against self-incrimination was abridged is cognizable on appeal inasmuch as defendant failed to preserve her right to challenge the admissibility of her statements at the time of plea. See State v. Robinson, 224 N.J.Super. 495, 498-501, 540 A.2d 1313 (App.Div.1988); see also R. 3:9-3(f). "Generally, a guilty plea constitutes a waiver of all issues that were or could have been raised in prior proceedings." Robinson, supra, 224 N.J.Super. at 498, 540 A.2d 1313. The exception found in R. 3:5-7(d) "pertains only to motions to suppress [physical] evidence allegedly obtained by reason of an unlawful search and seizure," not statements. State v. Smith, 307 N.J.Super. 1, 8, 704 A.2d 73 (App.Div.1997), certif. denied, 153 N.J. 216, 708 A.2d 67 (1998). We have thus held that "unsuccessful challenges to statements and Miranda violations cannot be raised on appeal after a guilty plea pursuant to R. 3:5-7(d)." Robinson, supra, 224 N.J.Super. at 500, 540 A.2d 1313 (citations omitted). Hence, R. 3:5-7(d) contains only a limited exception to the general rule of waiver of all constitutional issues following a guilty plea. See State v. Morales, 182 N.J.Super. 502, 508, 442 A.2d 1012 (App. Div.1981), certif. denied, 89 N.J. 421, 446 A.2d 150 (1982). Therefore, without a specific reservation of rights under R. 3:9-3(f), a defendant's constitutional challenge to *196 the admission of oral or written statements is not preserved for appeal.
In this case, defendant's plea was unconditional; she did not specifically reserve her right to challenge her oral statements on appeal and, therefore, the issue of the admissibility of defendant's statements was not preserved under R. 3:9-3(f).
Nonetheless, we have determined to consider the issue because the parties and the court treated the arguments raised by defendant under the Fourth Amendment as so inextricably intertwined with the "in custody" issue under Miranda, that we believe the interests of justice would not be served by our refusing to resolve the issue.[7] In other words, because defendant's oral statements were so integrally related to the seizure of the drugs in the suitcase, and because the same evidence necessarily would have to be presented at any pre-trial proceeding whether it be at a motion to suppress physical evidence or at a Miranda hearing where the State has the burden of proof, it would not advance judicial economy or efficiency to deprive defendant of an opportunity for our review of the Miranda argument. That notwithstanding, we believe the matter should be considered by the Criminal Practice Committee to the end that an appropriate court rule might be adopted to uniformly deal with this type of occurrence.

II.
We turn now to consider whether defendant's right against self-incrimination was violated by the DEA agents not having given defendant Miranda warnings before they questioned her concerning her ownership of the suitcase.
It is well settled that Miranda warnings are required when a person is subject to "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. Absent Miranda warnings, statements made by a defendant in custody, whether exculpatory or inculpatory, may not be used in the prosecutor's case-in-chief. State v. Hartley, 103 N.J. 252, 262, 511 A.2d 80 (1986). However, "[t]he rights set forth in Miranda are not implicated `when the detention and questioning is part of an investigative procedure rather than a custodial interrogation.' " Smith, supra, 307 N.J.Super. at 9, 704 A.2d 73 (citations omitted).
"Miranda turns on the potentially inquisitorial nature of police questioning and the inherent psychological pressure on a suspect in custody." State v. P.Z., 152 N.J. 86, 102, 703 A.2d 901 (1997) (citing Miranda, supra, 384 U.S. at 445-58, 86 S.Ct. at 1612-19, 16 L.Ed.2d at 707-14). "The requirement that interrogators warn suspects of certain rights is deemed necessary due to the pressure inherent in an `incommunicado interrogation of individuals in a police-dominated atmosphere[.]'" State v. Stott, 171 N.J. 343, 364, 794 A.2d 120 (2002) (quoting Miranda, supra, 384 U.S. at 445, 86 S.Ct. at 1612, 16 L.Ed.2d at 707) (alterations in original).
However, it is not always easy to discern when a suspect is "in custody." *197 Each case must be decided on its own set of facts. The test, however, is an objective one that focuses on the totality of the circumstances. See P.Z., supra, 152 N.J. at 102-03, 703 A.2d 901; see also State v. Pierson, 223 N.J.Super. 62, 67, 537 A.2d 1340 (App.Div.1988). One thing, however, is clear: neither formal arrest, handcuffs nor physical restraints in a police station is necessary to conclude that a suspect is in custody for purposes of the Miranda requirement; indeed "custody may occur in a suspect's home or a public place." State v. Godfrey, 131 N.J.Super. 168, 175, 329 A.2d 75 (App.Div.1974), aff'd o.b., 67 N.J. 267, 337 A.2d 371 (1975) (quoted in Stott, supra, 171 N.J. at 364, 794 A.2d 120). The "critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances." Stott, supra, 171 N.J. at 365, 794 A.2d 120 (quoting P.Z., supra, 152 N.J. at 103, 703 A.2d 901).
Those circumstances include the duration of the detention, the place and time of the interrogation, the nature of the questions and the language employed by the interrogator, the conduct of the police, the status of the interrogator, the status of the suspect, and any other relevant circumstances. See P.Z., supra, 152 N.J. at 103, 703 A.2d 901; Smith, supra, 307 N.J.Super. at 9, 704 A.2d 73; State v. Coburn, 221 N.J.Super. 586, 595-96, 535 A.2d 531 (App.Div.1987), certif. denied, 110 N.J. 300, 540 A.2d 1281 (1988).
For instance, an additional factor is whether the suspect knows that he or she is the focus of the police investigation. Stott, supra, 171 N.J. at 365, 794 A.2d 120 (citing State v. Pearson, 318 N.J.Super. 123, 134, 723 A.2d 84 (App.Div. 1999)). However, in Stansbury, the United States Supreme Court iterated its long-standing rejection of "the notion that the `in custody' requirement was satisfied merely because the police interviewed a person who was the `focus' of a criminal investigation." Stansbury v. California, 511 U.S. 318, 324, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 299 (1994) (citations omitted). Nonetheless, "an officer's ... beliefs concerning the potential culpability of the individual being questioned, may be ... [a] factor[ ] that bear[s] upon the assessment whether that individual was in custody[;] [but] only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." Stansbury, supra, 511 U.S. at 325, 114 S.Ct. at 1530, 128 L.Ed.2d at 330. However, "it `[is] the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning' [is] conducted" which implicates the Miranda requirements. Stansbury, supra, 511 U.S. at 323, 114 S.Ct. at 1529, 128 L.Ed.2d at 299 (quoting Beckwith v. United States, 425 U.S. 341, 346, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1, 7 (1976)).
In Stansbury, the United States Supreme Court summarized the principle this way:
An officer's knowledge or belief may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "freedom of action." ... In sum, an officer's [subjective] ... beliefs ... may be one of among many factors that bear upon the assessment whether that individual was in custody.

[Stansbury, supra, 511 U.S. at 325, 114 S.Ct. at 1530, 128 L.Ed.2d at 330 (citations omitted).]
*198 In short, an officer's subjective beliefs are a relevant factor in deciding whether a defendant was "in custody" for purposes of Miranda, but only to the extent those beliefs influenced the objective conditions surrounding his or her interrogation. Stansbury, supra, 511 U.S. at 326, 114 S.Ct. at 1530, 128 L.Ed.2d at 330.
We have carefully considered all the circumstances surrounding the detention of defendant in this case and conclude that the officers's questioning of defendant was constitutionally permissible without Miranda warnings.
As a threshold consideration, the investigatory stop passes constitutional muster. The officers here had a reasonable and particularized suspicion to believe that defendant was engaged in criminal activity. See State v. Stovall, 170 N.J. 346, 356, 788 A.2d 746 (2002) (citing Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). After the narcotics dog alerted to the presence of drugs in the only suitcase remaining on the carousel, and after defendant malingered outside the terminal for twenty minutes without retrieving the suitcase following her conversation with the sky cap, it was eminently reasonable for the DEA agents to have approached defendant, requested identification and asked her about the suitcase. When defendant gave them what the officers believed to be a false name and a suspicious story about Taihisha Brown not being on the flight from Los Angeles, and when defendant could not produce identification or a plane ticket to confirm her story that she had been on the flight, their suspicions grew that much stronger. Seeking to either confirm or dispel those suspicions, Detective Benoit asked defendant if she was willing to accompany him to the ticket office to see if American Airlines could clarify her status on the flight. We are satisfied that the "investigative stop" here was not so intrusive as to become a de facto arrest. See Dickey, supra, 152 N.J. at 476-78, 706 A.2d 180.
Nonetheless, defendant contends she was entitled to Miranda warnings because she was the focus of the investigation and because of the coercive environment, as evinced by the number of officers, their close proximity to her at the taxi stand, and the presence of the suitcase which was a clear manifestation of the officers' subjective beliefs as to her culpability. Hence, she insists she reasonably believed she was not free to leave, was "in custody" and therefore entitled to Miranda warnings. We disagree.
Although there were five officers from the DEA initially involved in the investigation who were close by to where Detective DellaSerra interfered with defendant's intention to get into the taxi, there is no evidence that they surrounded her or impeded her ability to move. Indeed, defendant acknowledged that even Detective DellaSerra simply asked if she would remain to speak to him. Moreover, although Detective DellaSerra's initial treatment of defendant when he asked her not to get into the taxicab may have been viewed as harassing and even intimidating by defendant, he ultimately backed off, leaving the investigation to Detective Benoit. In addition, the presence of all five officers in or near the taxi stand was fleeting, for when Detective Benoit arrived just moments later, Detective DellaSerra and the other officers stepped away. And only Detective Benoit and one other officer (not Detective DellaSerra) were with defendant when she agreed to go to the airline office. Further, there is no evidence in the record that Detective Benoit's manner in engaging defendant in conversation or the nature of his conversation was not polite and precatory in nature. That is, Detective Benoit did not demand that defendant accompany *199 him to the airline office; he simply asked her if she was willing to do so.
Further, the terminal was not a "coercive environment" with defendant isolated from other passengers. It was a public place. See Stott, supra, 171 N.J. at 365, 794 A.2d 120 (holding that defendant, a psychiatric hospital patient, was in custody when he was questioned in a "secluded basement area of the hospital" isolated from other patients and hospital personnel). Indeed, although defendant could have advanced an objection to either Detective DellaSerra's or Detective Benoit's requests to speak with her, she did not do so. But see Stovall, supra, 170 N.J. at 354, 788 A.2d 746 (involving an investigative stop where the defendant objected to Detective Benoit's detaining her after disembarking from a plane at Newark International Airport but where Miranda was not raised as an issue). In any event, the record is clear that defendant agreed to accompany Detective Benoit to the ticket office, and that he never raised his voice or took hold of defendant in any way on route to the office.
We recognize that defendant may have believed she was the focus of the DEA investigation and that she believed, therefore, that she was not free to leave. This is especially true in light of the officers' transporting of the suitcase outside, which arguably manifested their subjective beliefs that defendant was its guilty owner. But those circumstances alone are not determinative, although they do bear on the issue of whether they "would have affect[ed] how a reasonable person in [defendant's] position would perceive his or her freedom to leave[.]" Stansbury, supra, 511 U.S. at 325, 114 S.Ct. at 1530, 128 L.Ed.2d at 330. However, when viewed as part of the totality of the circumstances, these factors do not cause the balance to shift in favor of defendant.
Significantly, only five minutes elapsed from the outset of the actual encounter between Detective DellaSerra and defendant at the taxicab stand and Detective Benoit's request of defendant to accompany him to the airline office to check on her tickets. This short durational detention, together with the place, time and the manner of the questioning convinces us that under the totality of the circumstances, defendant's detention did not constitute a de facto arrest to entitle her to Miranda warnings. Accordingly, the suppression order is affirmed.

III.
Defendant argues that the consent to search her suitcase was not voluntary. The trial court did not address the effectiveness of defendant's consent to search the suitcase in her findings of fact and conclusions of law. However, probable cause to arrest defendant existed following her admission of guilt especially in light of the dog having "alerted" to the presence of drugs in the suitcase. Indeed, at oral argument before us, defense counsel admitted probable cause existed in these circumstances. Hence, the search of the suitcase was incident to defendant's arrest and her consent to search was not required.[8] That being so, we need not decide whether defendant's consent to search the suitcase was voluntary.
Affirmed.
STERN, P.J.A.D., concurring.
I join the opinion of the court, but write separately to voice my concern about the *200 procedural issues in this case. The avoidance of disparity of treatment among criminal defendants depends upon adherence to our rules of practice and procedure.
A guilty plea generally constitutes a waiver of any issue which was or could have been raised in advance thereof. See, e.g., Tollett v. Henderson, 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235, 243 (1973); State v. Smith, 307 N.J.Super. 1, 7-8, 704 A.2d 73 (App.Div.1997), certif. denied, 153 N.J. 216, 708 A.2d 67 (1998); State v. Robinson, 224 N.J.Super. 495, 498-99, 540 A.2d 1313 (App.Div.1988). While some of us might want a more liberal review in order to permit consideration of meritorious issues, and others would prefer no exception to the waiver rule because of the defendant's acknowledgment of guilt, the fact remains that our plea preservation rules evolved after extensive consideration and deliberation. See State v. Robinson, supra, 224 N.J.Super. at 499-504, 540 A.2d 1313. And they evolved during the same decade that "plea bargaining" was becoming acceptable. See R. 3:5-7(d); R. 3:9-3. See also, e.g., State v. Taylor, 80 N.J. 353, 360-61, 403 A.2d 889 (1979). As a result, the appealability of a pre-guilty plea decision usually is, or should be, considered during the plea negotiations.[1]
The State argues that defendant's guilty plea constituted a waiver of her right to challenge the admissibility of her oral statements to the police. Technically, the State is correct. Rule 3:5-7, which embodies a plea preservation rule notwithstanding the guilty plea, see R. 3:5-7(d), relates only to motions to suppress physical evidence. See, e.g., State v. Robinson, supra, 224 N.J.Super. at 500, 540 A.2d 1313. Thus, a trial court's decision to admit an oral statement is not subject to R. 3:5-7, and is therefore not subject to its plea preservation rule. As a result, the only manner in which this court could review a pre-plea decision to admit an oral statement of the defendant would be if, as part of a negotiated disposition, the plea was conditioned upon the preservation of the issue for purposes of appeal with the prosecutor's consent and approval of the court. See R. 3:9-3(f).
In this case it is clear from the record before us (notwithstanding the absence of the motion to suppress in the appendix) that the trial court and trial attorneys considered the question of the admissibility of defendant's statements as part of defendant's motion to suppress. Historically, they involve quite different issues and proceedings. See the historical background in State v. Robinson, supra, 224 N.J.Super. at 500-04, 540 A.2d 1313. The State has the obligation to prove the admissibility of defendant's statement, including adherence to Miranda[2] and its voluntariness, irrespective and independent of the filing of any motion to suppress by defendant. See, e.g., Biunno, Current N.J. Rules of Evidence, comments to N.J.R.E. 104(c) (Gann).
As developed in State v. Robinson, supra, 224 N.J.Super. at 502-03, 540 A.2d 1313, for years the admissibility of an oral statement was considered only after the jury was selected and empaneled, or jeopardy otherwise attached in a non-jury trial. However, in 1979 the Supreme Court amended our rules to permit the hearing of "issues relating to the admissibility of *201 statements by defendant," as well as "motions to suppress" and other issues involving the admissibility of evidence to be held pre-trial. See historical note to R. 3:9-1(d). The conditional plea rule, R. 3:9-3(f), was adopted in 1980 to avoid the need for unnecessary, long or costly trials in order to preserve for appeal those issues where the prosecutor consents to such preservation, with the approval of the court. See "Judicial Conference Report, Task Force on Postindictment Delay," 105 N.J.L.J. 521, 534 (1980). As a result of these rule changes, issues of admissibility are decided pre-trial and can be preserved for appeal if a defendant wants to contest the rulings and the prosecutor believes there is only a limited risk to the State by permitting the rulings to be appealed after a guilty plea.[3] Hence, the judicial rule that a guilty plea constitutes a "waiver" of the ability to challenge a pre-plea ruling must be honored unless the issue is preserved for appeal either by R. 3:5-7(d) in a case of physical evidence or the consent of the prosecutor under R. 3:9-3(f). See also R. 3:28(g).
In 1995, the Supreme Court implemented the "operating standards" for criminal practice and, as part thereof, amended R. 3:9-1 which requires the conduct of pretrial hearings prior to or at the pre-trial conference. See R. 3:9-1(d) and (e). It now appears that in cases such as this, and I suspect many cases, motions to suppress physical evidence and statements of a defendant are heard simultaneously and blended within the same proceeding.
In this case, given the relation between the defendant's statements and the physical evidence which were the subject of the motion to suppress at the consolidated hearing, and in the absence of any indication by the prosecutor of an objection to defendant's statement at sentencing that she was going to appeal "the motion to suppress,"[4] I join the majority in addressing the admissibility of the statements. Cf. State v. Stott, 335 N.J.Super. 611, 614, 622-23, 763 A.2d 324 (App.Div.2000), rev'd, 171 N.J. 343, 353, 364-68, 794 A.2d 120 (2002) (considering admissibility of statements as well as physical evidence notwithstanding a guilty plea); State v. Stephenson, 350 N.J.Super. 517, 519 n. 2, 796 A.2d 274 (App.Div.2002) (no exception by prosecutor to defendant's statement at plea hearing that he would appeal Miranda ruling); State v. Payton, 342 N.J.Super. 106, 775 A.2d 740 (App.Div. 2001); State v. Velez, 335 N.J.Super. 552, 555-56, 763 A.2d 290 (2000), certif. dismissed, 167 N.J. 624, 625, 772 A.2d 928 (2001) (permitting equal protection and due process claims of selective enforcement or "racial profiling" to be raised on appeal after guilty plea because of the relationship to the stop and search); State v. Smith, 306 N.J.Super. 370, 703 A.2d 954 (App.Div.1997) (considering admissibility of physical evidence and statements despite guilty plea).[5] I join the opinion in addressing the issue concerning the statements, despite my reservations about abandoning the finality our Rules were intended to provide, because of the inextricable and contemporaneous relationship between the statements made and the issues relating to the physical evidence.[6] *202 However, I emphasize my belief that this case should not signal the view that oral statements can normally be reviewed after a guilty plea merely because we either question the ruling below or feel such review is warranted "in the interests of justice." State v. Smith, supra, 307 N.J.Super. at 8, 704 A.2d 73.
NOTES
[1] Instead, at sentencing, defendant simply indicated her intention to appeal her "motion to suppress."
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Detective Kane's first name is not in the record.
[4] Defendant had a business suit jacket on top and a "skirt [that] looked like a slip [on the bottom which] struck [Detective Benoit] as being a little odd."
[5] The motion judge discounted this latter testimony as not credible.
[6] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[7] We note also that the prosecutor did not object when defense counsel indicated at sentencing she was going to appeal "the motion to suppress." See State v. Stephenson, 350 N.J.Super. 517, 519 n. 2, 796 A.2d 274 (App. Div.2002) (noting that prosecutor had not objected to defendant's appeal of the Miranda ruling).
[8] Defendant does not contend that if the arrest was valid a search of the suitcase as incident to that arrest required a warrant.
[1] Today, decisions on motions relating to the admissibility of evidence are made at or before the pretrial conference is conducted, at which the State's "final plea offer" is considered and a "plea cut off" is generally fixed. R. 3:9-1(d) and (e); R. 3:9-3(g).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The Rule requires prosecutorial consent so that the prosecutor, as part of the negotiated disposition, can evaluate the risks of reversal after the evidence may become stale or unavailable. 105 N.J.L.J., supra, at 534-35.
[4] In fact, the judge granted defendant's motion for bail pending appeal.
[5] The opinions in Stott and Smith do not indicate if the waiver issue was raised.
[6] The officers may have treated the suitcase as abandoned had defendant not acknowledged possession.