SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Terrell L. Hubbard** (A-56-13) (073539)

**Argued January 6, 2015 -- Decided June 24, 2015**

**CUFF, P.J.A.D. (temporarily assigned), writing for a majority of the Court.**

In this appeal reviewing the determination on defendant's motion to suppress, the Court addresses the applicable standard of review when part of the evidence considered by the trial court consists of a videotape of statements that defendant made during an interview at the police station, and whether the circumstances of that interview constitute a custodial interrogation warranting the administration of warnings under Miranda v. Arizona, 384 U.S. 436 (1966) (Miranda).

On October 20, 2008, defendant called 9-1-1 requesting assistance for his five-month old daughter, reporting that she was not breathing. When the police arrived, the infant was in an ambulance about to be taken to the hospital. Medical technicians informed the responding officers that the child was in critical condition. Defendant told a detective that, upon observing his daughter lying in bed, he noticed that she was not breathing. Defendant then called 9-1-1 for assistance and administered CPR. After speaking with a detective at the house, defendant acceded to the detective's request that he come to the police station to provide further information that may be helpful for his daughter's treatment. Prior thereto, a police sergeant told the detective that the house would be secured as a crime scene. Defendant was at the police station for a total of three hours (including breaks), during which he was interviewed for some forty minutes. Defendant told the detective that, earlier in the day, his girlfriend told him that the baby was cranky, and he tried to calm her over several hours. After advising defendant that the baby is at the hospital and doctors were able to get a pulse, albeit a weak one, the detective asked defendant if the baby had fallen, or been accidentally dropped. Defendant responded in the negative. The detective also asked defendant about his relationship with his girlfriend, whether her pregnancy was a surprise, how the baby's birth had altered his life, and whether defendant ever became frustrated with the baby and resented her. At the conclusion of the interview, the detective drove defendant home. At no time prior to or while at the police station was defendant given Miranda warnings. Defendant's daughter was declared dead three days later.

Approximately 7 months later, defendant was arrested, and after being read his Miranda rights, admitted that he tossed the baby toward the bed, causing her to hit the wall. Defendant was subsequently indicted for second-degree manslaughter contrary to N.J.S.A. 2C:11-4(b)(1), and second-degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4(a). The trial court granted defendant's motion to suppress his October 20, 2008 statement, concluding that defendant was in custody at the time of the interview and that his rights were violated when he was not administered Miranda warnings. In reaching its conclusion, the court relied on several key factors regarding the detective's interaction with defendant, including the detective's instruction that defendant sit in a certain chair to permit the video camera to obtain a full face view of defendant, the detective's physical proximity to defendant, and the probing nature of the questions that defendant was asked. The court also relied on testimony of witnesses at the evidentiary hearing demonstrating that the detective asked defendant to accompany him to the police station, defendant was placed in the back seat of the unmarked police car, defendant and the detective did not converse during the ride to the police station, and the house was secured to prevent entry by anyone. The trial court found that, under all of the circumstances, no reasonable person in defendant's position would have felt free to leave the room or the police station.

The Appellate Division granted the State's motion for leave to appeal, and reversed. The Appellate Division found that this Court's ruling in State v. Diaz-Bridges, 208 N.J. 544 (2012), permitted it to conduct a de novo review of the trial record, without deferring to the findings of fact and credibility assessments made by the trial court, having concluded that the trial court based its findings of fact solely on the videotape that was equally available to the appellate court, without reliance upon other testimony. The Appellate Division conducted a de novo review of the videotape, and concluded that defendant had not been subjected to a custodial interrogation. The court

held that the failure to provide Miranda warnings therefore did not require suppression of defendant's statement.

The Court granted defendant's motion for leave to appeal.   217 N.J. 281 (2014)

**HELD:**  Where a trial court relies on evidence in addition to a videotaped statement, including testimony presented to it, traditional rules of appellate review control and require deference to the findings of fact and credibility assessments made by the trial court.  An appellate panel must therefore review the entire record to determine if the factual findings are supported by substantial credible evidence, rather than engage in de novo review of the record. Under this deferential standard of review, the trial court properly concluded, based on its review of the entire record, that defendant was the subject of a custodial investigation and therefore should have been given Miranda warnings.

1. An appellate court reviewing a grant or denial of a motion to suppress evidence must defer to the factual findings of the trial court provided those findings are supported by sufficient evidence in the record.  Deference by an appellate court is not required only when the trial court's findings of fact are clearly mistaken.  In that event, the reviewing court must examine the record, make findings of fact, and apply the governing law.  In contrast, a trial court's interpretation of the law is not entitled to special deference, and is subject to de novo review.  (pp. 14-15)

2. Although the means of recording statements, including custodial interrogations, have evolved over time from a stenographic record to audio and now video recording, the deference accorded to the findings of fact by the trial judge upon appellate review has not changed.  The required deference is not limited to credibility findings by the trial court, but extends to findings of fact generally.  In certain fact-sensitive contexts, appellate review may require examination of a videotaped statement or proceedings, and not be confined to a review of the transcript.  However, review of an electronic record is not intended to elevate the appellate panel's evaluation of that record over the factual findings of the trial court.  The Court explained in Diaz-Bridges, supra, 208 N.J. at 565-66, that de novo review of a videotaped statement on appeal is confined to the rare case in which the videotape is the only evidence before the trial court, or the trial court unequivocally relies on no other evidence to resolve the motion to suppress. (pp. 15-18)

3.  Under Miranda, a confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her constitutional rights.  Although a defendant may waive any or all of those rights, the waiver must be voluntary, knowing and intelligent.  The failure to administer Miranda warnings prior to custodial interrogation creates a presumption of compulsion.  If warnings were required by not given, statements made in the absence of the warnings must be suppressed even if otherwise voluntary under the Fifth Amendment.  (pp. 18-19)

4. Custodial interrogation" has been defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  "Custody" for purposes of Miranda warnings does not require a formal arrest, nor physical restraint in a police station.  Whether a suspect has been placed in custody is a fact-sensitive inquiry and may not easily be discerned.  The critical determinant is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, rather than on the subjective views of law enforcement personnel or the person being questioned.  Investigative questioning directed at an individual who is not a suspect does not require Miranda safeguards.  The State bears the burden of proving beyond a reasonable doubt the voluntariness of a defendant's statements.  (pp. 19-22; 26-27)

5. In Diaz-Bridges, the Court referenced the videotape of the defendant's custodial interrogation and delineated exceptionally limited circumstances when appellate review required reference to the video record.  208 N.J. at 565.  Here, because the trial court relied on evidence other than the videotaped statement of defendant, the traditional standard of appellate review is applicable.  The inquiry is whether the factual findings of the trial court are supported by substantial credible evidence, rather than de novo review.  The Appellate Division erred when it dismissed the findings of fact of the trial court and conducted a de novo review of the record.  (pp. 22-26)

6.  In light of the conditions, substance and duration of the detective's interview of defendant, combined with the events at defendant's home, the trial court's conclusion that defendant's interview was custodial in nature is supported by credible, factual evidence in the record, and the proper application of governing law.  The interview, conducted without administration of defendant's Miranda rights, must be suppressed.  (pp. 26-28)

2

The judgment of the Appellate Division is **REVERSED**, and the matter is **REMANDED** to the Law Division for further proceedings.

**JUSTICE ALBIN, CONCURRING,** agrees with the majority that a deferential standard of review applies in this case. However, stating that the law must adapt to technological advances, Justice Albin notes that the applicable standard of review of videotaped evidence is an important judicial-policy issue on which other courts have reached differing results, and which remains to be decided by this Court after serious dialogue and thoughtful consideration in a case where the issue is squarely presented.

**CHIEF JUSTICE RABNER, and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in the opinion of JUDGE CUFF (temporarily assigned). JUSTICE ALBIN filed a separate, concurring opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

TERRELL[1] L. HUBBARD,

    Defendant-Appellant.


        Argued January 6, 2015 – Decided June 24, 2015

        On appeal from the Superior Court, Appellate
        Division.

        Wayne Powell argued the cause for appellant.

        David M. Galemba, Assistant Prosecutor,
        argued the cause for respondent (Jennifer
        Webb-McRae, Cumberland County Prosecutor,
        attorney).

        Sara M. Fedorczyk, Deputy Attorney General,
        argued the cause for amicus curiae Attorney
        General of New Jersey (John J. Hoffman,
        Acting Attorney General, attorney).


    JUDGE CUFF (temporarily assigned) delivered the opinion of

the Court.

    On October 20, 2008, police responded to a 9-1-1 call

requesting assistance for an injured child.  The child was

---

[1] Defendant's first name is misspelled as "Terrell" in the
Appellate Division decision and the parties' submissions.  In
his October 20, 2008 police interview, defendant specifically
explained that his name is spelled with "one R."

1

defendant Terrell Hubbard's five-month-old daughter, Lanaya. When police arrived, the infant was in an ambulance about to be transported to the hospital. Medical technicians informed the responding police officers that the child was in critical condition.

Defendant told a detective that he found his daughter lying on the bed and noticed that she was not breathing. He placed a 9-1-1 call and performed CPR while waiting for assistance. Defendant acceded to the detective's request to come to the police station to provide information that might be helpful to medical professionals treating his daughter. Defendant was in the police station for a total of three hours, which included three breaks, ranging from a few minutes to two hours in duration. After the interview was concluded, the detective drove defendant home. The detective never administered Miranda[2] warnings to defendant. Defendant's daughter was declared dead three days later.

A grand jury returned an indictment charging defendant with second-degree manslaughter, contrary to N.J.S.A. 2C:11-4(b)(1), and second-degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4(a). The trial court granted defendant's motion to suppress his October 20, 2008 statement. The court

---

[2]  Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

concluded that defendant was in custody at the time of the interview and that police had failed to advise defendant of his Miranda rights. The Appellate Division granted the State's motion for leave to appeal and reversed. The panel determined that this Court's recent ruling in State v. Diaz-Bridges, 208 N.J. 544 (2012), permitted it to conduct a de novo review of the trial record, without deferring to the findings of fact and credibility assessments of the trial court, because it concluded that the trial court had based its findings of fact solely on the videotape of the October 20 interview. The appellate panel found that defendant had not been subject to a custodial interrogation; therefore, the failure to administer Miranda warnings to defendant at the beginning of the interview did not require suppression of the statement. We granted defendant's motion for leave to appeal.

In Diaz-Bridges, the Court emphasized that de novo review of a video record is confined to the rare case in which the videotaped statement is the only evidence before the trial court or the trial court clearly and unequivocally relies on no evidence other than the videotaped statement to resolve the motion to suppress. Id. at 565-66. In this matter, we have not been asked to examine the standard of review set forth in Diaz-Bridges. There is no need to do so for in this matter the traditional rules governing appellate review of trial court

3

findings control and should have been applied by the Appellate Division. The trial court relied on evidence other than the videotaped statement, including testimony presented to it when making its findings.

We further determine that the interview conducted by the detective at the police station was a custodial interrogation and the failure to administer Miranda warnings prior to the interview requires suppression of that recorded statement.

                                I.

On October 20, 2008, defendant Terrell Hubbard was alone with Lanaya, his five-month-old daughter, at the home he shared in Vineland with the child's mother and her father. The child's mother left Lanaya in defendant's care to go to the dentist before reporting to work. At approximately 3:30 p.m., defendant placed a 9-1-1 call to report that his daughter was not breathing. The operator instructed defendant how to administer CPR as he awaited the arrival of emergency medical assistance. Emergency medical personnel arrived at defendant's home before the police. After restoring the child's heartbeat, medical personnel placed her in an ambulance for transport to a hospital. Police arrived just before the ambulance departed. A medic informed Detective Jeff Travaline that the child was in critical condition.

After speaking to the medic, the detective went to the porch of the house, where defendant stood with another police officer. The detective asked defendant what had happened to the baby. Defendant stated that the child was lying on the bed and had been crying. He picked her up, realized she was not breathing, and placed the call for assistance. When a police sergeant informed Travaline that he wanted to secure the house as a crime scene, Travaline and the sergeant conducted a "walk-through" to confirm that no one else was in the house. Defendant remained on the porch with a police officer.

After locking the front door, Travaline asked defendant to accompany him to the police station. Defendant assented and Travaline drove him to the police station.

The parties disputed the circumstances surrounding defendant's trip to the police station. Travaline maintains that he offered to drive defendant because defendant's vehicle was being used by his girlfriend. Defendant, however, insists that he had ready access to a vehicle but was given no option other than to ride in Travaline's car. The trial court found that the detective offered defendant no option, directing him to the backseat of his unmarked police vehicle. Defendant and Travaline did not converse during the drive to the station. Defendant sat in the backseat of the vehicle.

Defendant was not handcuffed or patted down at any time that day. According to Travaline, defendant was not a suspect at that time; he was simply being interviewed to provide a fuller understanding of what transpired so that additional information could be relayed to the medical professionals treating defendant's daughter.

At approximately 4:17 p.m., defendant entered an interview room at the station. He sat alone for almost three minutes before being joined by Travaline. After providing defendant with water, Travaline asked him to move to a different seat in the corner of the room. The move permitted defendant to face the video camera. Travaline sat across from defendant, between him and the door. Defendant was in the interview room for almost three hours. During that period, Travaline asked defendant questions for about forty minutes. Defendant was never advised of his Miranda rights that day.

Defendant told Travaline that, earlier in the day, his girlfriend informed him that the baby was cranky. Defendant tried to calm the baby over several hours. Eventually, he placed her on the bed and went to the kitchen to prepare something to eat. On his return to the bedroom, he noticed that the baby "was flimsy and . . . wasn't breathing," so he called 9-1-1. Travaline then asked defendant to "back up a little bit" and clarify a few things. The detective's questions focused on

defendant's movements and his interaction with his daughter. Defendant provided additional detail, explaining that Lanaya had been uncharacteristically fussy the night before and that her mother had given the child Tylenol earlier that day.

At one point during the interview, Travaline left the room and returned about eight minutes later, informing defendant that the "[b]aby's down at the hospital. They are still working on her. They do have a . . . pulse. It is a weak pulse, though."

Returning to the interview, Travaline asked defendant if Lanaya had fallen or been accidentally dropped, or if defendant may have been distracted at any point while watching her. Defendant answered each of these questions in the negative. Travaline asked defendant about his relationship with his girlfriend, whether her pregnancy was a surprise, and how the birth of the baby had altered his life. Travaline also asked if he was ever advised or counselled to treat the infant gently, whether he ever got frustrated with the baby, if he loved her, and if he ever resented her.

The exchange proceeded as follows:

> [Q]: [T]here's a reason that she, uh, there
> is a reason that we're here. There is a reason
> that she stopped breathing. You know and . .
> .
>
> [A]: I know.
>
> [Q]: . . . and I don't understand . . . the
> time period that you['re] giving[. It]

7

doesn't account or explain why she would stop breathing, I mean?

[A]:  [I] never heard of anything . . . like this, especially happening to my daughter.

. . . .

[Q]:  You ever get mad because the baby's, you know, not mad, mad[ is] the wrong word, maybe frustrated?

[A]:  Yeah.

. . . .

[Q]:  Did you get a little frustrated at all this afternoon?

[A]:  Um, no I . . . I wasn't with her long. I mean after a couple hours in the same . . . same crying and whining . . .

. . . .

[Q]:  You love this baby?

[A]:  Like so much.  I never had nothing like this.  I got her name tattooed on my arm.

. . . .

[Q]:  Just seem indifferent, you know.

[A]:  Just everything changed when the baby was born.  Stuff I could do before[.]  I loved playing basketball.  I don't do it much.  I think this summer I played about five times through the whole summer.

. . . .

[Q]:  This wasn't a planned event, having a baby?

[A]:  No.  No.

8

[Q]: [Y]ou ever resent the baby or . . . or her, you know for [. . .]

[A]: [W]hat happened . . .

[Q]: Uh-huh.

[A]: No.  I mean, if it happened, it was meant to happen.  Just how it goes.  I'm not regretting anything . . . .

At 5:12 p.m., after about an hour in the interview room, Travaline told defendant that he was going to check the baby's status and that he would return in a few minutes.  After an absence of approximately two hours, Travaline returned to the room, apologized for the wait, and told defendant he would drive him home.

Defendant's daughter died three days later.  The medical examiner's report noted a number of healing bruises and fractures, including a broken clavicle and three broken ribs.  An examination of the child's large intestine indicated some form of impact to that organ.  The medical examiner also noted abnormal swelling of the brain and fluid in the spinal cord.  A neurologist opined that a bleeding malformation in the child's brain likely caused her to become increasingly fussy and to cry.  The neurologist also opined that the child sustained a traumatic injury to the brainstem and spinal cord.

The police arrested defendant on May 7, 2009, approximately seven months after the October 2008 interview.  Sergeant Alexis

9

Sheftall read defendant his Miranda rights, and Sheftall and Travaline questioned defendant. Eventually, defendant admitted that he tossed Lanaya toward the bed, causing her to hit the wall. When defendant noticed that she had stopped breathing, he called 9-1-1.

II.

The grand jury returned an indictment charging defendant with second-degree reckless manslaughter, contrary to N.J.S.A. 2C:11-4(b)(1), and second-degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4(a). In a motion to suppress the recorded October 20, 2008 statement, defendant argued that the interview was a custodial interrogation and any statements made during that interview should be suppressed because the detective never advised him of his Miranda rights.

The Law Division judge conducted a suppression hearing on February 9 and 16, 2012, at which Travaline and defendant testified and the court viewed the October 20, 2008 videotaped statement. The trial court confirmed the undisputed fact that the detective did not administer Miranda warnings to defendant before or at any time during his interview. The court also found that defendant was in custody during the October 20 interview. The court stated that several factors influenced this finding, including Travaline's instruction that defendant sit in a certain chair to permit the camera to obtain a full-

10

face view of defendant, Travaline's physical proximity to defendant, and the probing nature of the questions posed to defendant. In addition, the court cited several other facts presented by witnesses at the evidentiary hearing in support of its finding that defendant had been the subject of a custodial interrogation, including Travaline's request for defendant to accompany him to the police station, placing defendant in the back seat of the unmarked police car, securing the house to prevent entry by anyone, and preparing a crime log. The court also found that no reasonable person in defendant's position would have felt free to leave the room or the police station. An order dated March 22, 2012, suppressed the October 20 statement in its entirety.

The Appellate Division granted the State's motion for leave to appeal and reversed the March 22, 2012 order. Quoting Diaz-Bridges, supra, 208 N.J. at 566, the appellate panel determined that it need not defer to the factual findings of the trial court because "'the trial court's factual findings [we]re based only on its viewing of a recorded interrogation that [wa]s equally available to the appellate court and w[ere] not dependent on any testimony uniquely available to the trial court.'" The panel conducted a de novo review of the videotape of the October 20 interview and concluded that the totality of the circumstances did not support the finding that "defendant

11

was subject to 'the inherent psychological pressure on a suspect in custody.'" (Quoting State v. Brown, 352 N.J. Super. 338, 351 (App. Div.), certif. denied, 174 N.J. 544 (2002)). The panel also determined that the trial court erred in attaching any significance to the fact that Travaline suspected that the child's injuries had been inflicted by someone. The panel also dismissed the import of the detective's request that defendant sit in a certain chair or the detective's posture.

This Court granted defendant's motion for leave to appeal. 217 N.J. 281 (2014).

### III.

Defendant argues that the Appellate Division erred by limiting its review of the record to just the videotape of the October 20 interview and then conducting a de novo review of that statement. In doing so, defendant asserts that the appellate panel misapplied Diaz-Bridges, because this is not a case in which the trial court relied solely on the videotaped statement. Rather, defendant contends that the trial court plainly stated that it relied on more evidence than simply the videotaped statement. Defendant argues that the panel was required to defer to the factual findings of the trial court, which were well-supported by the entire record. Finally, defendant insists that the facts, as found by the trial court, lead to the inexorable conclusion that defendant was subject to

12

a custodial interrogation without the benefit of <u>Miranda</u> warnings on October 20, 2008, and that his statement must therefore be suppressed.

The State responds that "to the extent that the motion judge made any factual findings beyond the videotape, they are not proper considerations." Therefore, the State contends that the Appellate Division was not required to defer to any findings of fact made by the trial judge and was free to limit its review to the videotape and make its own findings of fact and draw its own conclusions of law. The State argues that defendant freely and voluntarily entered the police station, that defendant was not subject to restraint or an otherwise coercive environment, that he freely and voluntarily responded to all questions posed by the detective, and that defendant was never told he could not leave. Therefore, the interview had none of the hallmarks of a custodial interrogation, and the detective was not required to administer <u>Miranda</u> warnings to defendant.

The Attorney General, appearing as amicus curiae, submits that the Appellate Division properly adopted a de novo standard of review. The Attorney General concedes that an appellate tribunal should defer to the findings of fact of a trial court based on witness testimony, but contends that the findings of fact made by the trial court were founded solely on the videotape of the October 20 statement. Therefore, the appellate

13

panel was not required to defer to the trial court's findings of fact. Finally, the Attorney General submits that defendant was never in custody. Rather, the October 20 interview was nothing more than "part of an investigatory procedure" that did not require administration of Miranda warnings to defendant.

IV.

A.

Appellate courts reviewing a grant or denial of a motion to suppress must defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record. State v. Gamble, 218 N.J. 412, 424 (2014); State v. Elders, 192 N.J. 224, 243 (2007). We defer to those findings of fact because they "are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). An appellate court should disregard those findings only when a trial court's findings of fact are clearly mistaken. Id. at 162. In those situations, the interests of justice require the reviewing court to examine the record, make findings of fact, and apply the governing law. Ibid. A trial court's interpretation of the law, however, and the consequences that flow from established facts are not entitled to special deference. State v. Gandhi, 201 N.J. 161,

14

176 (2010).  A trial court's legal conclusions are reviewed de novo.  Ibid.

The rule of deference announced in Johnson, and endorsed repeatedly through the years, see, e.g., Elders, supra, 192 N.J. at 243; State v. Locurto, 157 N.J. 463, 470-71 (1999), arose in the context of stenographically recorded proceedings. Gradually, memorialization of the record progressed from the stenographer to audio recordings to video recordings.  Following a comprehensive study of "whether and how to implement the benefits of recording electronically part, or all, of custodial interrogations," State v. Cook, 179 N.J. 533, 561 (2004), the Court adopted Rule 3:17 in 2005, which generally requires electronic recordation of custodial interrogations of those charged with certain enumerated serious offenses.  Rule 3:17(a) outlines a series of circumstances in which the electronic recordation requirement applies when the person being interrogated is charged with murder, aggravated manslaughter, or manslaughter.  Rule 3:17(b) outlines circumstances when the electronic recordation requirement does not apply.  For example, subsection (b)(vii) does not require electronic recordation of a statement given during an interrogation when the law enforcement officer conducting the interrogation has no knowledge that a crime for which a recording is required has been committed.  The State bears the burden of proof by a preponderance of the

15

evidence to establish that an exception to the recordation requirement applied. R. 3:17(b).

Although the means of recording statements or proceedings have changed, the deference accorded to the findings of fact of the trial judge has not. See Elders, supra, 192 N.J. at 243-44 (reiterating need to defer to factual findings derived from record consisting of testimony of officers and videotape record of motor vehicle stop). That deference is not limited to credibility findings by the trial court. Indeed, in the course of rejecting the notion that appellate deference to factual findings should be limited to credibility findings, the United States Supreme Court commented that "[d]uplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, . . . requiring [the parties] to persuade three more judges at the appellate level is requiring too much." Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S. Ct. 1504, 1512, 84 L. Ed. 2d 518, 529 (1985).

Nevertheless, the introduction of electronic recordation of court proceedings and certain investigative proceedings, such as custodial interrogations, has triggered questions about whether the traditional standard of appellate review should be maintained. In Diaz-Bridges, supra, the Court indicated that

16

when assessing the totality of the circumstances in certain fact-sensitive contexts, such as an assessment of whether a defendant invoked his right to remain silent or to terminate an interrogation or to request counsel, appellate review may require consultation of the videotaped statement. 208 N.J. at 565. The Court remarked as follows:

> As it relates to the invocation of the right to remain silent, both the words used and the suspect's actions or behaviors form part of the inquiry into whether the investigating officer should have reasonably believed that the right was being asserted. As a result, the court's inquiry necessarily demands a fact-sensitive analysis to discern from the totality of the circumstances whether the officer could have reasonably concluded that the right had been invoked. For this reason, it may be inadequate to confine appellate review to the transcript of the interrogation. Instead, as this appeal demonstrates, if the trial court has based its findings on conduct or behaviors that defendant exhibited during a videotaped interrogation that may be observed and analyzed with equal precision by an appellate court, a review of the videotape of the interrogation is appropriate.
>
> [Ibid.]

Notably, the Court emphasized that it did not intend to elevate the appellate panel's evaluation of the videotape over the factual findings of the trial court. Id. at 565-66. Rather, an appellate panel can confine its review to the recording of the interrogation "[w]hen the trial court's factual findings are based only on its viewing of a recorded interrogation." Id. at

17

566. In Diaz-Bridges, it is clear that the Court referred to the videotaped statement to verify the findings of fact. The Court did not conduct a de novo review of the suppression hearing record.

### B.

A confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her constitutional rights. Miranda, supra, 384 U.S. at 492, 86 S. Ct. at 1637, 16 L. Ed. 2d at 734. A defendant may waive any or all of those rights; however, that waiver must be "voluntary, knowing and intelligent." State v. Hreha, 217 N.J. 368, 382 (2014).

In Miranda, supra, the United States Supreme Court held that in order to safeguard a suspect's Fifth Amendment right against self-incrimination, confessions obtained during custodial interrogations are inadmissible as evidence unless the defendant has been advised of his or her constitutional rights. 384 U.S. at 492, 86 S. Ct. at 1637, 16 L. Ed. 2d at 734; see Dickerson v. United States, 530 U.S. 428, 431-32, 120 S. Ct. 2326, 2329, 147 L. Ed. 2d 405, 412 (2000).

The failure to administer Miranda warnings prior to custodial interrogation "creates a presumption of compulsion." Oregon v. Elstad, 470 U.S. 298, 307, 105 S. Ct. 1285, 1292, 84 L. Ed. 2d 222, 231 (1985). Hence, if warnings were required but

18

not given, the unwarned statements must be suppressed -- even when they "are otherwise voluntary within the meaning of the Fifth Amendment." Ibid.; see also State v. O'Neill, 193 N.J. 148, 170 (2007); State v. O'Neal, 190 N.J. 601, 616 (2007).

"Custodial interrogation" was defined by the United States Supreme Court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, supra, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706. Thus, the protections provided by Miranda are only invoked when a person is both in custody and subjected to police interrogation. State v. P.Z., 152 N.J. 86, 102 (1997). Essentially, "Miranda turns on the potentially inquisitorial nature of police questioning and the inherent psychological pressure on a suspect in custody." Ibid. (citing Miranda, supra, 384 U.S. at 445-58, 86 S. Ct. at 1612-19, 16 L. Ed. 2d at 707-14).

"[C]ustody in the Miranda sense does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station." Id. at 103 (internal quotation marks omitted). On the other hand, "[i]f the questioning is simply part of an investigation and is not targeted at the individual because she

19

or he is a suspect, the rights provided by <u>Miranda</u> are not implicated." <u>State v. Timmendequas</u>, 161 <u>N.J.</u> 515, 614-15 (1999) (citing <u>State v. Pierson</u>, 223 <u>N.J. Super.</u> 62, 67 (App. Div. 1988)), <u>cert. denied</u>, 534 <u>U.S.</u> 858, 122 <u>S. Ct.</u> 136, 151 <u>L. Ed.</u> 2d 89 (2001). Moreover, "<u>Miranda</u> warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" <u>California v. Beheler</u>, 463 <u>U.S.</u> 1121, 1125, 103 <u>S. Ct.</u> 3517, 3520, 77 <u>L. Ed.</u> 2d 1275, 1279-80 (1983) (quoting <u>Oregon v. Mathiason</u>, 429 <u>U.S.</u> 492, 495, 97 <u>S. Ct.</u> 711, 714, 50 <u>L. Ed.</u> 2d 714, 719 (1977)); <u>see</u> <u>State v. Marshall</u>, 148 <u>N.J.</u> 89, 225-26, <u>cert. denied</u>, 522 <u>U.S.</u> 850, 118 <u>S. Ct.</u> 140, 139 <u>L. Ed.</u> 2d 88 (1997).

Indeed, "[w]hether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernible." <u>State v. Stott</u>, 171 <u>N.J.</u> 343, 364 (2002). "The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." <u>P.Z.</u>, <u>supra</u>, 152 <u>N.J.</u> at 103; <u>see also</u> <u>Timmendequas</u>, <u>supra</u>, 161 <u>N.J.</u> at 614.

The relevant inquiry is determined objectively, based on "how a reasonable [person] in the suspect's position would have

understood his situation," Berkemer v. McCarty, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L. Ed. 2d 317, 336 (1984); see P.Z., supra, 152 N.J. at 103, and "not on the subjective views harbored by either the interrogating officers or the person being questioned," Stansbury v. California, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529, 128 L. Ed. 2d 293, 298 (1994).

"Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 1689, 64 L. Ed. 2d 297, 307-08 (1980). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301, 100 S. Ct. at 1689-90, 64 L. Ed. 2d at 308; see State v. Bey, 112 N.J. 45, 68 n.13 (1988).

Furthermore, the State bears the burden of proving beyond a reasonable doubt that a defendant's confession is voluntary and not resultant from actions by law enforcement officers that overbore the will of a defendant. Hreha, supra, 217 N.J. at 383; State v. Galloway, 133 N.J. 631, 654 (1993). The State bears a similarly high burden when a defendant challenges a statement procured by a law enforcement officer without the

21

benefit of Miranda warnings.  See State v. Clausell, 121 N.J. 298, 352-53 (1990).

We apply these principles to the facts of this case, focusing first on the deference owed by an appellate panel to a videotaped statement.

V.

A.

This Court has subscribed unequivocally and continuously to the traditional rule that an appellate tribunal should adhere to the findings of fact of the trial court and must avoid disturbing those findings unless the evidential record provides insufficient support for those findings.  Gamble, supra, 218 N.J. at 424; Elders, supra, 192 N.J. at 243-44; Locurto, supra, 157 N.J. at 470-71; Johnson, supra, 42 N.J. at 162.  Notably, in Elders, supra, the Court rejected unequivocally the approach of the appellate panel in that case "that the availability of a videotape of the troopers' encounter with defendants, particularly in the context of a hearing where witnesses testified, extinguishes the deference owed to a trial court's findings."  192 N.J. at 244.  The most oft-cited reason for such deference is the unique position of the trial court to observe the presentation of the evidence, to evaluate the demeanor of the witnesses, and to resolve discrepancies between testimony and physical or documentary evidence.  Ibid.  But, there are

22

reasons beyond credibility determinations that require deference. The visual record simply cannot capture the entirety of an interrogation, an evidentiary hearing, or a trial because the focus of the camera is too narrow.

Recently, in Diaz-Bridges, supra, the Court referenced the videotape of the custodial interrogation of the defendant on several occasions. 208 N.J. at 551, 556, 562, 570. The Court explained that it did so because the question of whether a defendant has invoked the right to remain silent is a fact-sensitive inquiry that may require an evaluation of the words uttered by the suspect and his actions contemporaneous with any utterance in order to determine whether "the investigating officer should have reasonably believed that the right was being asserted." Id. at 565. The Court emphasized, however, that it did not intend to alter the traditional appellate standard of review of trial court fact-finding and further delineated exceptionally limited circumstances when appellate review required reference to the video record of an interrogation. Ibid. The Court stated:

> We do not suggest that we have altered our admonition to appellate courts that they give due deference to the fact-finding role of the trial courts. See State v. Locurto, 157 N.J. 463, 471 (1999) (concluding that reviewing court should defer to factual findings of trial judge as long as they can reasonably be reached on sufficient credible evidence present in the record). Indeed, as

23

> we have recently reiterated, if the trial
> court has had the benefit of and has relied
> upon testimony of witnesses, appellate courts
> must give due deference to those findings
> because it is the trial court that had the
> opportunity to evaluate the credibility of the
> witnesses who appeared and testified. Elders,
> supra, 192 N.J. at 245 (observing that trial
> court based its evaluation on police testimony
> because patrol car's videotape showed only
> part of interaction with individuals involved
> in traffic stop).
>
> [Id. at 565.]

Thus, an appellate tribunal must defer to the factual findings of the trial court when that court has made its findings based on the testimonial and documentary evidence presented at an evidentiary hearing or trial. Deference is also not confined simply to credibility findings. To be sure, when the evidence consists of testimony of one or more witnesses and a videotaped recording of a statement by a witness or a suspect, an appellate court is obliged to review the entire record compiled in the trial court to determine if the factual findings are supported by substantial credible evidence in the record. Locurto, supra, 157 N.J. at 470-71. The appellate panel may reference a videotaped statement to verify a specific finding. It may not substitute its interpretation of events. An evidentiary hearing in the trial court or a trial conducted by a judge sitting without a jury is "the main event," not a "tryout

on the road." See Wainright v. Sykes, 433 U.S. 72, 90, 97 S. Ct. 2497, 2508, 53 L. Ed. 2d 594, 610 (1977).

This appeal is not one of those cases in which the trial record was confined to a video record of the interrogation. We acknowledge that the trial court referred to the videotape of the October 20 interrogation and that certain findings of fact are premised on that review. Witness testimony, however, played a key role in the trial court's analysis of the record and its findings of fact. The trial court made repeated references to defendant's interactions with police at his home. The trial court specifically noted that defendant's daughter was being treated by emergency medical personnel at his home and then transported to the hospital by ambulance. Yet, the trial court found that Travaline sequestered defendant and then escorted defendant to the police station in a police vehicle. The trial court observed that a witness who was not suspected of a criminal act would not have been treated in that fashion. The trial court also expressly referred to the testimony provided by Travaline in which he initially described the circumstances of the child's condition as "suspicious." The trial court also referenced the detective's initial interaction with defendant at the house, the creation of a crime log, the securing of the house, and the actions taken by police at the house before they escorted defendant to the police station to answer questions.

25

The trial court was uniquely situated to integrate the testimony and the video record to formulate its findings of fact. The appellate panel was not free to conduct a de novo review of the videotape, reject the findings of fact of the trial court, and substitute its own findings. The Appellate Division therefore erred when it dismissed the findings of fact of the trial court and conducted a de novo review of the record of the motion to dismiss.

Our review of the entire record, including the detective's testimony and giving the required deference to the trial court's findings, including those pertaining to the credibility of the detective, leads us to conclude that those findings are supported by the entirety of the testimonial and videotaped record. The final inquiry is whether the trial court properly applied the governing law to those factual findings to conclude that defendant was the subject of a custodial interrogation.

B.

The protections provided by Miranda apply only when a person is both in custody and subjected to police interrogation. P.Z., supra, 152 N.J. at 102. On the other hand, mere investigative questioning directed at an individual who is not a suspect does not implicate Miranda. Timmendequas, supra, 161 N.J. at 614-15 (citing Pierson, supra, 223 N.J. Super. at 67).

26

Essentially, the issue hinges on the inquisitorial nature of the questioning and "the inherent psychological pressure" experienced by a suspect in custody. P.Z., supra, 152 N.J. at 102. "The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." Id. at 103.

In the present case, the officers secured defendant's house as a crime scene. The trial court found that Travaline directed defendant to ride in the police cruiser to the station. Meanwhile, his daughter was in critical condition and removed from her home by emergency medical personnel to a hospital for treatment. Although not handcuffed, defendant rode in the backseat of the vehicle. Defendant and Travaline did not converse at all during the drive.

Upon arrival at the station, defendant was directed into an interrogation room, where he sat alone for several minutes. When Travaline entered, he instructed defendant to move into the chair in the corner of the room, farthest from the door. The officer positioned himself between defendant and the door.

The detective questioned defendant for approximately an hour before exiting the room, leaving defendant to wait approximately two hours. The detective never advised defendant

27

that he was free to leave, even after relaying the news that the hospital was able to restore and maintain his daughter's heartbeat.

During the interview, the detective's questions roamed far from merely obtaining information that might assist the child's treatment. Specifically, the detective asked defendant to account for all of his movements on his return from work. He inquired whether defendant may have been distracted at any point while watching his daughter, if he ever got frustrated with the baby, if he loved the baby, and if he ever resented the baby. Rather than an attempt to secure information that may have assisted the child's treatment, the targeted questions reflect a clear attempt on the part of the detective to cause defendant to incriminate himself.

In light of the conditions, substance, and duration of the interview, combined with the events at defendant's home, the trial court's conclusion that the October 20 interview was custodial in nature is sufficiently supported by credible, factual evidence in the record and the proper application of governing law. The October 20 interview, conducted without administration of defendant's Miranda rights, must be suppressed.

VI.

28

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division for further proceedings.


CHIEF JUSTICE RABNER, and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in the opinion of JUDGE CUFF (temporarily assigned). JUSTICE ALBIN filed a separate, concurring opinion.

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

TERRELL L. HUBBARD,

    Defendant-Appellant.


    JUSTICE ALBIN, concurring.

    I fully concur with the majority's opinion that a deferential standard of review applies in assessing the trial court's finding in this case. The trial court's finding that defendant was in custody when questioned without Miranda[1] warnings was based on hearing in-court witness testimony and reviewing defendant's videotape statement.

    Significantly, this case does not involve a trial court's fact-finding based solely on the review of a videotape statement. In State v. Diaz-Bridges, 208 N.J. 544, 566 (2012), in a passing sentence to which no authority is cited, this Court stated that "[w]hen the trial court's factual findings are based only on its viewing of a recorded interrogation that is equally available to the appellate court and are not dependent on any

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

1

testimony uniquely available to the trial court, deference to the trial court's interpretation is not required." The standard of review was not an issue in Diaz-Bridges and therefore was not a subject of discussion. The time will come -- when the issue is properly raised -- to have a serious dialogue and to give thoughtful consideration to the standard of appellate review of trial-court findings based on a videotape of an interrogation or some other event.

A number of jurisdictions have addressed the appellate-review standard when a trial court's findings are based on videotape of some event, such as an interrogation or a search. Federal appellate courts take a deferential approach in such cases for reasons found in the United States Supreme Court's decision in Anderson v. Bessemer City, 470 U.S. 564, 574-75, 105 S. Ct. 1504, 1511-12, 84 L. Ed. 2d 518, 528-30 (1985). There, the Court listed the policy goals advanced for a deferential appellate standard of review of non-testimonial evidence:

> Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
>
> This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.
>
> . . . .

2

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.
>
> [Ibid. (internal citations omitted).]

Federal Rule of Civil Procedure 52(a)(6) was amended the same year that the United States Supreme Court released its decision in Anderson. That Rule provides: "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6) (emphasis added).

The Advisory Committee on the 1985 amendments to Fed. R. Civ. P. 52(a) explained its reasons for adopting the clearly erroneous standard for testimonial and non-testimonial evidence:

> The principal argument advanced in favor of a more searching appellate review of findings by the district court based solely on documentary evidence is that the rationale of Rule 52(a) does not apply when the findings do not rest on the trial court's assessment of credibility of the witnesses but on an evaluation of documentary proof and the drawing of inferences from it, thus eliminating the need for any special deference to the trial court's findings. These considerations are outweighed by the public interest in the stability and judicial economy that would be promoted by

3

> recognizing that the trial court, not the appellate tribunal, should be the finder of the facts. To permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.
>
> [Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment.]

Thus, Fed. R. Civ. P. 52(a)(6) calls for the application of the clearly erroneous standard to physical or documentary evidence, including videotapes. Although the Federal Rules of Criminal Procedure do not contain a similar rule, "the considerations underlying Rule 52(a) -- the demands of judicial efficiency, the expertise developed by trial judges, and the importance of first-hand observation -- all apply with full force in the criminal context, at least with respect to factual questions having nothing to do with guilt." Maine v. Taylor, 477 U.S. 131, 145, 106 S. Ct. 2440, 2451, 91 L. Ed. 2d 110, 125 (1986) (internal citation omitted). For example, findings made by a trial court at a suppression hearing, based on a review of a video recording of a police stop, are given deference. See United States v. Murphy, 703 F.3d 182, 188-89 (2d Cir. 2012) (applying clear-error standard in reviewing video evidence in suppression hearing); United States v. Prokupek, 632 F.3d 460, 462-63 (8th Cir. 2011) (applying clear-error standard in

4

reviewing video evidence in suppression hearing from traffic stop); <u>United States v. Simpson</u>, 609 <u>F.</u>3d 1140, 1146 (10th Cir. 2010) (stating that appellate court "defers to the district court's finding of facts and reviews them solely for clear error, even when . . . there is video tape of the stop and detention"); <u>United States v. Santos</u>, 403 <u>F.</u>3d 1120, 1128 (10th Cir. 2005) ("The increasing availability of videotapes of traffic stops due to cameras mounted on patrol cars does not deprive district courts of their expertise as finders of fact, or alter our precedent to the effect that appellate courts owe deference to the factual findings of district courts."); <u>United States v. Navarro-Camacho</u>, 186 <u>F.</u>3d 701, 707-08 (6th Cir. 1999) (applying clear-error standard in reviewing evidence in suppression hearing involving video evidence).

State courts have split on the appropriate standard of appellate review when the evidence at a hearing is a videotape of either an interrogation or some other police interaction. Some state courts favor a deferential standard. <u>See, e.g.</u>, <u>Robinson v. State</u>, 5 <u>N.E.</u>3d 362, 365 (Ind. 2014) (stating that even when "faced with video evidence," "appellate standard of review remains constant" and that court "do[es] not reweigh the evidence"); <u>State v. Williams</u>, 334 <u>S.W.</u>3d 177, 181 (Mo. Ct. App. 2011) (stating that when reviewing video evidence from suppression hearing "[u]nder the 'clearly erroneous' standard of

5

review, the trial court's findings of fact are entitled to deference even where they are based on physical or documentary evidence which is equally available to an appellate court"); Montanez v. State, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006) (embracing U.S. Supreme Court's approach in Anderson and holding that "deferential standard of review . . . applies to a trial court's determination of historical facts when that determination is based on a videotape recording admitted into evidence at a suppression hearing").

Other state courts favor a de novo review. See, e.g., People v. Hughes, 3 N.E.3d 297, 313 (Ill. App. Ct. 2013) (stating that appellate court's "eyes are just as functional a[s] the trial court's" in reviewing video evidence evaluated in making suppression ruling), appeal denied, 5 N.E.3d 1126 (Ill. 2014); Commonwealth v. Novo, 812 N.E.2d 1169, 1173 (Mass. 2004) (reviewing video evidence de novo and stating that "lower court findings based on documentary evidence available to an appellate court are not entitled to deference"); State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000) ("[W]hen a court's findings of fact at a suppression hearing are based solely on evidence that does not involve issues of credibility, such as the videotape evidence in this case, the rationale underlying a more deferential standard of review is not implicated.").

6

The law must adapt to technological advances.  The videotaping of interrogations has become a current law enforcement practice and is mandated by court rule in defined circumstances.  See R. 3:17.  Today, video cameras are mounted in many police vehicles recording motor vehicle stops and searches.  Body cameras worn by police officers may soon be an integral part of an officer's uniform.  In the near future, it may be that an officer's interaction with a suspect will be video-recorded from beginning to end, from a street arrest to an interrogation at police headquarters.

Whether a videotape of events is the sole evidence or one piece of evidence should not be determinative of the standard of review.  It does not follow logically that a videotape of an interrogation when mixed with live testimony should be viewed deferentially, but when standing alone should be viewed without deference.  The standard of review for fact-findings of videotape evidence should not vary from one hearing to another.

How appellate courts review a trial court's fact-findings based on a videotape is an important judicial-policy issue.  On the proper occasion, when the issue is squarely before us, we should give full consideration to all the competing rationales favoring either deference or de novo review.

SUPREME COURT OF NEW JERSEY

NO. ___A-56___ SEPTEMBER TERM 2013

ON APPEAL FROM Appellate Division, Superior Court

STATE OF NEW JERSEY,

Plaintiff-Respondent,

v.

TERRELL L. HUBBARD,

Defendant-Appellant.

DECIDED June 24, 2015

Chief Justice Rabner PRESIDING

OPINION BY Judge Cuff (temporarily assigned)

CONCURRING/DISSENTING OPINIONS BY Justice Albin

DISSENTING OPINION BY

| CHECKLIST | REVERSE AND REMAND | CONCUR |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | (X) | X |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |